## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

BRETT KELLY
PATRICIA BORDEN KELLY
11807 POND CREST COURT
NEW MARKET, MD  21774-6101

    Plaintiffs

    **v.**             Case No.: _____

BANK OF AMERICA, NA
SERVE ON:
The Corporation Trust Incorporated,
Resident Agent
351 West Camden Street
Baltimore, MD 21201

    And

WELLS FARGO BANK, NA, AS
TRUSTEE FOR THE CERTIFICATE-
HOLDERS OF ASSET BACKED
SECURITIES CORPORATION HOME
EQUITY LOAN TRUST, SERIES
WMC 2005-HE5, ASSET BACKED
PASS-THROUGH CERTIFICATES,
SERIES WMC 2005-HE5
9062 Old Annapolis Road
Columbia, MD   21045

    Defendants

2012 AUG -1

## COMPLAINT

&

## REQUEST FOR JURY TRIAL

Plaintiffs, Brett Kelly and Patricia Borden Kelly ("the Kelly Family"), through their

undersigned counsel files this Complaint and Request for Jury Trial against Defendants

1

Bank of America, NA ("BOA") and Wells Fargo Bank, NA, as Trustee for the Certificate-Holders of Asset Backed Securities Corporation Home Equity Loan Trust, Series WMC 2005-He5, Asset Backed Pass-Through Certificates, Series WMC 2005-He5 ("WMC 2005-He5 MBS") and says:

## I. INTRODUCTION

1. The underlying matter involves just one of thousands of other similar situations across the State where homeowners are (i) seeking to change and modify their current mortgage loans without requesting additional credit, (ii) complying with all information requests of their servicer/lender, hoping to obtain changes and modifications, yet (iii) having all their reasonable steps ignored in bad faith, leaving the homeowners with no other option but to seek assistance of the Courts to recover from the illegal harm and damages they have sustained.

2. These claims concern the utter failure of Defendants BOA and WMC 2005-He5 MBS, to comply with Maryland law related to the Kelly Family's reasonable and appropriate requests to modify their mortgage loan subject to this action, without seeking additional credit.

3. Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation. The Kelly Family has a sustainable solution, yet the Defendants, by and through their authorized agents and employees, have not acted in good faith and have unfairly and deceptively botched the Kelly Family's modification and loss mitigation efforts in violation of state law or regulations.

2

4. Further, and very significant to the Kelly Family, but for the botched loss mitigation efforts and misrepresentations and omissions by the Defendants, the Kelly Family would not have suffered the direct and proximate damages resulting from the unresolved mortgage situation which continues to cause significant economic and non-economic losses for them.

## II. PARTIES

5. Brett Kelly and Patricia Borden Kelly are residents of the State of Maryland and the owners of the real property commonly known as 11807 Pond Crest Court, New market, MD 21774 ("the Property").

6. Defendant Bank of America, N.A. ("BOA") is a mortgage lender and servicer, headquartered in Charlotte, NC, that regularly conducts business in Maryland. Bank of America currently services the Kelly Family's "first mortgage" on behalf of WMC 2005-He5 MBS the true owner and secured party of the first mortgage. BOA is also the successor in interest by merger to BAC Loan Servicing, LLP, with which it merged as of July 1, 2011 at a time when the Kelly Family's loan was in default. BOA is also the authorized agent of Defendant WMC 2005-He5 MBS.

7. Defendant Wells Fargo Bank, NA, as Trustee for the Certificate-Holders of Asset Backed Securities Corporation Home Equity Loan Trust, Series WMC 2005-He5, Asset Backed Pass-Through Certificates, Series WMC 2005-He5 ("WMC 2005-He5 MBS") is a mortgage-backed security which operates in the State of Maryland and has an address in the State of Maryland, according to public filings, at 9062 Old Annapolis Road, Columbia, MD 21045.

### III. JURISDICTION & VENUE

8. This Court has proper jurisdiction because Defendants transact business and perform work and services in Maryland and each has availed themselves to the jurisdiction of this Court through their appointed agents and foreclosure trustees.

9. Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

10. Venue is appropriate in this Court because the Defendants conduct business within Baltimore City, Maryland.

### IV. FACTS

#### A. The Foreclosure Crisis

11. Over the last four years, Maryland, and indeed, the United States, has been in a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

12. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

13. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps even, surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

14. The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products have yet to reach their zenith. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis,

Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

## B. Maryland's Response to the Foreclosure Crisis

15. In 2007, at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according to the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.[1]

16. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court.[2]

17. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate practices. These bills were passed with nearly full bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

> Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid

---

[1] Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007) *available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf (footnotes omitted).

[2] *See Id.* at 40-43.

6

foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

*Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2)*, emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

*Senate Bill 217/House Bill 360* define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as

7

well as the notarizing of any document in connection with a mortgage loan.[3]

18. The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure. Writing for the Committee the Honorable Alan M. Wilner explained:

> The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.
>
> In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.[4]

19. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in

---

[3] Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) available at http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

[4] Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

communications, transactions, and course of dealings with a borrower in connection with the...servicing...of any mortgage loan, including, but not limited to...(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20.

## C.    ENFORCEMENT ACTIONS BY THE UNITED STATES OFFICE OF THE COMPTROLLER OF THE CURRENCY & 50-STATE ATTORNEY GENERALS

21. In the fourth quarter of 2010, in response to widespread allegations of deficiencies and unsafe or unsound practices in residential servicing, the Office of the Comptroller of the Currency of the United States of America ("OCC") conducted on-site reviews of the foreclosure and loss mitigation practices of fourteen federally regulated mortgage servicers, including BOA. *See* Interagency Review of Foreclosure Policies and Practices (April 2011), at 1, *available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

22. On April 13, 2011, as a result of those reviews, the OCC announced, that it had taken "formal enforcement actions against eight national bank mortgage servicers and two third-party servicer providers for unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing." BOA was one of those servicers. *See* Press Release, Office of the Comptroller of the Currency, OCC Takes Enforcement Action Against Eight Servicers for Unsafe

and Unsound Foreclosure Practices (Apr. 13, 2011) *available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.

23. In resolution of the OCC enforcement action against it, BOA entered into a Consent Order with the OCC on April 13, 2011. *See* Consent Order *available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

24. In the consent order, BOA "committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes." Consent Order at 1-2.

25. Among the actions BOA agreed to take under the consent order are the following:

> [Create a] compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order are conducted in a safe and sound manner. . . The Compliance Program shall include at a minimum:
>
> ...
>
> Changes or upgrades to ...ensure the ongoing accuracy of records for all serviced mortgages.
>
> ...
>
> [Measures to] (i) ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans.
>
> Consent Order at 7, 10, 18-19.

26. On or about April 4, 2012, BOA also entered into a consent judgment with nearly every Attorney General of every state including Maryland in which it agreed to

change its unfair and deceptive servicing practices including many in which are subject to this action. A copy of that consent judgment may be located at https://d9klfgibkcquc.cloudfront.net/Consent_Judgment_BoA-4-11-12.pdf.

**D.     The Kelly Family's Mortgage Subject to this Action**

27. On or about March 23, 2005, the Kelly Family purchased the Property for $450,000 where they live today with their children.

28. As part of the purchase of the Property for personal purposes, the Kelly Family was steered to an exotic, subprime loan product by their original lender NFM, Inc. dba National Fidelity Mortgage Corporation which involved two loans: (i) a first mortgage loan in the sum of $360,000 which is secured by a Deed of Trust in the land records of Frederick County, Maryland at Book 5224/Page 006 ("First Mortgage"); and (ii) a second mortgage loan in the original sum of $90, 000 which is secured by a Deed of Trust in the land records of Frederick County, Maryland at Book 5224/Page 023 ("Second Mortgage").

29. Upon information and belief, NFM, Inc. was merely a nominal lender in name only and actually table funded the First Mortgage and Second Mortgage on behalf of WMC Mortgage Corporation ("WMC") which was a mortgage banking company in the State of California. This belief is based upon the representations made in the Prospectus Supplement dated June 1, 2005 (Reg. File No. 333-122372), related to the formation of WMC 2005-He5 MBS, which states, "WMC Mortgage Corp.'s originations come primarily through its broker relationships. As of May 16, 2005, WMC Mortgage Corp. had approximately 2,250 employees, including approximately 534 business development representatives and

11

associates who are responsible for recruiting and managing the independent broker network." Page S-55.

30. The servicing rights of the First Mortgage were transferred from Option One Mortgage to Countrywide Home Loans, Inc. effective July 1, 2005. BOA acquired the servicing rights of the First Mortgage Loan as of July 1, 2011 from BAC Loan Servicing, LLP at a time when the Kelly Family loan on the First Mortgage was in default. BAC Loan Servicing, LLP acquired the servicing rights from Countrywide Bank and its affiliates as a result of BOA's parent acquisition of the same and its subsidiaries in early 2009.

31. According to a public filing in the land records of Frederick County, Maryland (i.e. Assignment of Deed of Trust at Book 8814, Page 101), WMC 2005-He5 MBS acquired "all beneficial interest" related to the First Mortgage on March 23, 2012. At the time WMC 2005-He5 MBS acquired the First Mortgage, BOA and WMC 2005-He5 MBS believed the First Mortgage was in default. BOA also represented this fact to the Kelly Family in multiple correspondence dated April 2, 2012.

   a) **The Kelly Family's Mortgage Situation with Bank of America & WMC 2005-He5 MBS**

32. Unfortunately, and like millions of other Americans and Maryland residents, the Kelly Family has experienced a severe reduction of income and the toxic loan(s) arranged for them have exploded and adjusted to sums which are not sustainable. Specifically, Ms. Kelly lost her position through a failed business partnership, the Kelly Family's expenses have increased with the birth of their

12

second child, and during Mr. Kelly's severance period with a former employer the family incurred significant direct health care expenses.

33. In good faith the Kelly Family has exhausted their savings while attempting proactively to modify their First Mortgage to something which is reasonable and affordable to them given their circumstances and will not result in a loss to WMC 2005-He5 MBS through a foreclosure sale. However, BOA has unfairly and deceptively stonewalled all their reasonable efforts.

34. In an effort to be proactive before they defaulted, the Kelly Family contacted BOA in September 2011 for the purpose of seeking a modification which would adjust their First Mortgage monthly mortgage payment to 31% of their total pretax monthly income. Mr. Kelly specifically called Bank of America at its call center located at 800-846-222 for this purpose on September 17, 2011.

35. On October 6, 2011 BOA informed the Kelly Family in writing that their monthly mortgage payments (with escrows) was going to increase significantly on December 1, 2011 by over 17%.

36. In response to the October 6, 2011 letter to BOA and their own decrease household income, Mr. Kelly contacted BOA on October 19, 2011 and spoke to a representative for about 36 minutes about the contents of the October 6, 2011 letter and the Kelly Family's situation. The BOA representative stated and represented to Mr. Kelly that the Kelly Family would need to be about 90 days late in order to be able to discuss what modification programs were available to help the Plaintiffs. This statement was a knowing and intentional

13

misrepresentation by the BOA representative. The BOA representative also instructed Mr. Kelly to contact a different BOA phone number, i.e. 800-669-0102, regarding further loss mitigation options for the Kelly Family.

37. In reliance and in response to the direction provided to him by BOA's representative on October 19, 2011, Mr. Kelly did contact BOA at its 800-669-0102 number on October 20, 2011 at 9:58am and 1:00pm. Finally on October 25, 2011, BOA agreed to send the entire modification package to the Kelly Family even though at the time the Kelly Family was then current on their mortgage modification package.

38. The Kelly Family received a letter from BOA dated November 17, 2011 regarding their request to be considered for a loan modification. This letter asked the Kelly Family to send BOA a list of specific information in order to be considered for a modification of their loan without request seeking additional credit.

39. In reliance to BOA's offer dated November 17, 2011, the Kelly Family completed the modification application and submitted the application on December 12, 2011 at 4:55pm (by Fedex delivery) seeking to adjust and modify their current mortgage loan, without requesting additional credit, by adjusting their monthly mortgage payment to 31% of their total pretax monthly income. Included with the request the Kelly Family provided all the information requested by BOA (i.e. Completed RMA, IRS 4506T, Dodd-Frank Certification, Copy of Current Utility Bill, Copy of HOA due letter, two recent paystubs, and two months of each

14

current bank statement) (hereinafter referred to as "First Modification Request").
No specific acknowledgement or denial was ever received by the Kelly Family
regarding this application.

40. On December 16, 2011 Deborah Renick-Adams wrote to the Kelly Family to
explain that she would serve as the "dedicated customer relationship manager"
for the Kelly Family in their efforts to modify their First Mortgage and Second
Mortgage (even though the Kelly Family was only at that time attempting to
modify their First Mortgage). Ms. Adams represented to the Kelly Family that she
would provide "continuous status updates" to the Kelly Family and be responsive
to their inquiries as to their loss mitigation options. As demonstrated below, Ms.
Adams has failed to provide the Kelly Family with continuous status updates and
has botched the Kelly Family's good faith efforts to resolve any modification
related to their modification requests related to their First Mortgage.

41. Throughout the last six months as described herein, the Kelly Family has
attempted and has in fact responded to each request of Ms. Adams. However,
on multiple occasions she has not responded to the Kelly Family's inquiries or
simply ignored their requests for information including those made by telephone
on: January 11, 2012 at 5:42pm; February 6, 2012 at 5:38pm and 5:44pm;
February 21, 2012 at 7:42am and 11:11am; March 16, 2012 at 1:35pm; March
16, 2012 at 4:10pm; May 1, 2012 at 4:33pm; May 1, 2012 at 4:36pm.

a) Trying to be responsible borrowers, the Kelly Family enlisted on March 28,
2012 the assistance of Kevin Kim, a BOA Banking Center manager at

branch ID# MD9-920-01-01 located at 5704 Buckeystown Pike in Frederick, MD 21704 to contact Ms. Adams on their behalf to get her to respond to certain of their inquiries.

b) Trying to be responsible borrowers, the Kelly Family again enlisted on May 3, 2012 the assistance of Fernanda Ashurian, a BOA employee at branch ID# MD9-920-01-01 located at 5704 Buckeystown Pike in Frederick, MD 21704 to contact Ms. Adams on their behalf to get her to respond to certain of their inquiries.

42. The Kelly Family received an offer dated February 2, 2012 (by fed-ex) from BOA to apply again for a loan modification. This letter asked the Kelly Family to send BOA a list of specific information in order to be considered for a modification of their loan without request seeking additional credit.

43. On February 17, 2012 Ms. Adams requested Mr. Kelly by telephone to provide certain additional documents as part of their First Modification application. All of these required documents (including a complete 2010 Tax return, undated paystubs, utility bill, recent HOA statement, letter of hardship, stock/bond statements, and update bank statements) were sent by the Kelly Family to Ms. Adams at BOA on March 3, 2012. The Kelly Family had actually attempted to send the complete package by email at Ms. Adam's suggestion but the email address provided by Ms. Adams never worked after numerous attempts on February 20, 2012.

44. On February 22, 2012 at 5:49pm the Kelly Family were referred to the services of a certified housing counselor recognized by the State of Maryland's Department of Housing and Community Development, Brad Peterson, to act on their behalf in order to help move their modification applications along with BOA and MS. Adams in particular.

45. The Kelly Family received an offer dated March 5, 2012 (by fed-ex) from BOA to apply for regarding a loan modification. This letter asked the Kelly Family to send BOA a list of specific information in order to be considered for a modification of their loan without request seeking additional credit.

46. On March 12, 2012, BOA sent the Kelly Family and the Maryland Department of Labor, Licensing, and Regulation a materially false and defective Notice of Intent to Foreclose which falsely identified "Wells Fargo" as the secured party of the Kelly Family's First Mortgage. The NOI also indicated that BOA believed the Kelly Family was in default on their First Mortgage as of January 2, 2012. This representation by BOA was knowingly false and misleading because:

    a) BOA had identified in the land records of Frederick County, Maryland (by an Assignment of Deed of Trust at Book 8895, Page 223) just a few weeks later that Mortgage Electronic Registration Systems, Inc. was the "holder" of the First Mortgage before March 23, 2012. BOA also represented this fact to the Kelly Family in correspondence dated May 25, 2012.

17

47. WMC 2005-He5 MBS also knowingly permitted BOA to send the false March 12, 2012 NOI on its behalf since it is the statutory duty of WMC 2005-He5 MBS to send the NOI.

48. Frustrated that their good faith efforts to seek a modification on their own were being stonewalled by BOA, the Kelly Family engaged the services of Maryland housing counsel Brad Peterson on March 25, 2012 who is employed at the Frederick Community Action Agency as a housing counselor.

49. On the Kelly Family's behalf, Mr. Peterson submitted through the Hope Loan Portal system on March 30, 2012 a completed the modification application seeking to adjust and modify their current mortgage loan on the First Mortgage, without requesting additional credit, by adjusting their monthly mortgage payment to 31% of their total pretax monthly income. Included with the request Mr. Peterson on the Kelly Family's behalf provided all the information requested by BOA (hereinafter referred to as "Second Modification Request"). No specific acknowledgement or bona fide denial was ever received by the Kelly Family regarding this application.

50. BOA did request the Kelly Family through Brad Peterson for additional information and documents. Through Brad Peterson all of the requested documents and information for the Second Modification Request was provided to BOA by April 26, 2012 through the Hope Loan Portal system by the Kelly Family who reasonably relied upon BOA's representations through Ms. Adams and to their housing counselor.

18

51. On April 26, 2012, at 2:15pm, Ms. Adams pledged to Mr. Kelly that she would keep working with the Kelly Family until a solution would be reached. However, as the facts demonstrated this representation was false.

52. Ms. Adams wrote a letter dated May 1, 2012 to the Kelly Family requesting additional documents that had already been provided by Mr. Peterson on behalf of the Kelly Family.

53. Ms. Adams also wrote a letter dated May 2, 2012 to the Kelly Family falsely stating their modification request concerning the Second Mortgage was denied because they had not sent in the required paperwork. This letter was false and misleading in that the Kelly Family had not applied yet for a modification on their Second Mortgage and they had in fact provided all the information requested by BOA on multiple occasions.

54. On May 10, 2012, the Kelly Family received another letter from BOA's representative Ms. Adams which was false and misleading by stating that the Kelly Family were denied a loan modification on the First Modification because they had not sent in the required paperwork when in fact they had done so themselves and through their housing counselor Mr. Peterson.

55. BOA never meaningfully considered the Kelly Family with a modification and has instead proceeded on a path to other alternatives such as short sale. This conclusion is based upon the false and misleading statements in writing and orally by BOA's representatives in this situation to the Kelly Family and to their housing counselor. Further, BOA referred the Kelly Family's "account" to an

agent of BOA, NDS (which stands upon information and belief for National Default Servicing Corporation) for the purpose of urging the Kelly Family to consider a short sale of the Property as the means to pay the First Mortgage.

a) NDS called Mr. Kelly on April 2, 2012 at 9:17am and 9:34am making these representations to Mr. Kelly in light of BOA's regular and routine referrals of homeowners who are unlikely to get a loan modification.

b) NDS is not a Maryland licensed mortgage servicer or a licensed Maryland collection agency but it holds itself out to the public as a "nationwide default servicing" company which specializes in "Foreclosures, Bankruptcies, Evictions, Deeds in Lieu and a host of other default related services." See http://www.ndscorp.com/.

c) By employing unlicensed companies to provide services on its behalf BOA is using unfair and deceptive practices as part of its mortgage services.

56. As part of her pattern and practice, Ms. Adams failed to respond to Mr. Peterson's inquiries on behalf of the Kelly Family.

57. On April 2, 2012, BOA sent the Kelly Family and the Maryland Department of Labor, Licensing, and Regulation a materially false and defective Notice of Intent to Foreclose which falsely identified "Wells Fargo" as the secured party of the Kelly Family's First Mortgage. The NOI also indicated that BOA believed the Kelly Family was in default on their First Mortgage as of March 2, 2012. This representation by BOA was knowingly false and misleading because:

a) BOA had identified in the land records of Frederick County, Maryland (by an Assignment of Deed of Trust at Book 8895, Page 223) that WMC 2005-He5 MBS acquired "all beneficial interest" related to the First Mortgage on March 23, 2012. BOA also represented this fact to the Kelly Family in correspondence dated May 25, 2012

b) BOA indicated that the sum requested to cure the Kelly Family's default equaled $1,806.29 when in fact another letter sent to the Kelly family by BOA on April 2, 2012 indicated the sum due equaled $1,039.11.

58. WMC 2005-He5 MBS also knowingly permitted BOA to send the false, April 2, 2012 NOI on its behalf since it is the statutory duty of WMC 2005-He5 MBS to send the NOI.

59. On April 9, 2012 BOA responded to the Kelly Family's request and promised the Kelly Family that their First Mortgage would also be considered for modification under the global settlement it has reached with the Department of Justice and State Attorneys General. Upon the filing of this complaint, BOA has never informed the Kelly Family if in fact it did consider them for options under this settlement.

60. On April 19, 2012, Mr. Kelly presented BOA with a qualified written request ("QWR") under the Real Estate Settlement Procedures Act (RESPA) seeking the name and identity of the "bank or investor" that owns his mortgage. BOA acknowledged receipt of the QWR on April 26, 2012.

61. On April 13, 2012, BOA sent the Kelly Family a letter regarding a modification of their Second Mortgage which is also serviced by BOA. This letter falsely suggested that the Kelly Family had also sought to modify the Second Mortgage when in fact they had not.

62. On May 25, 2012 BOA knowingly misrepresented the name of the investor of the Kelly Family's First Mortgage in response to Mr. Kelly's QWR by identifying the investor solely as "Wells Fargo Bank, N.A." This representation by BOA was knowingly false and misleading because not a month before it had executed and caused to be recorded in the land records of Frederick County, Maryland a Assignment of Deed of Trust (Book 8895, Page 223) in which WMC 2005-He5 MBS was presented as the assignee and investor/own of the First Mortgage.

63. On May 9, 2012, BOA sent the Kelly Family a letter, signed by Deborah Renick-Adams, in which it falsely and misleadingly stated related to the First Mortgage, "You are not eligible for a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and a time frame required to provide them was sent to you more than 30 days ago." This representation by BOA was knowingly false and misleading because:

   a) The Kelly Family had sent all the requested documents to BOA s detailed above.

   b) The Kelly Family's certified housing counselor Brad Peterson had also sent all the required and requested documents as detailed above.

22

c) BOA representatives never acknowledged to the Kelly Family by telephone that it had not received all the documents requested despite the Kelly Family's numerous, good faith efforts to confirm everything was on track as detailed above.

d) BOA representatives acknowledged to the Kelly Family's housing counselor Brad Peterson that it has received all the documents requested.

64. On May 10, 2012 BOA sent the Kelly Family another letter in which it falsely and misleadingly stated related to the First Mortgage, "Your loan is not eligible for a modification because you did not provide us with the documents we requested." This representation by BOA was knowingly false and misleading because:

a) The Kelly Family had sent all the requested documents to BOA s detailed above.

b) The Kelly Family's certified housing counselor Brad Peterson had also sent all the required and requested documents as detailed above.

c) BOA representatives never acknowledged to the Kelly Family by telephone that it had not received all the documents requested despite the Kelly Family's numerous, good faith efforts to confirm everything was on track as detailed above.

d) BOA representatives acknowledged to the Kelly Family's housing counselor Brad Peterson that it has received all the documents requested.

65. On May 14, 2012 BOA sent the Kelly Family another letter in which it falsely and misleadingly stated related to the First Mortgage, "Your loan is not eligible for a modification because you did not provide us with the documents we requested." This representation by BOA was knowingly false and misleading because:

  a) The Kelly Family had sent all the requested documents to BOA s detailed above.

  b) The Kelly Family's certified housing counselor Brad Peterson had also sent all the required and requested documents as detailed above.

  c) BOA representatives never acknowledged to the Kelly Family by telephone that it had not received all the documents requested despite the Kelly Family's numerous, good faith efforts to confirm everything was on track as detailed above.

  d) BOA representatives acknowledged to the Kelly Family's housing counselor Brad Peterson that it has received all the documents requested.

66. Because of BOA's inherent conflict as the servicer on the Kelly's First Mortgage and Second Mortgage it has botched any and all efforts by the Kelly Family's to obtain a modification of the their First Mortgage because once the Kelly Family accomplishes that reasonable result, they will likely be eligible for a modification of the Second Mortgage under the Second Lien Modification Program which might extinguish the Kelly Family's Second Mortgage to which BOA retains the profitable servicing rights.

**E. Economic Damages Sustained by the Kelly Family Arising from Bank of America and WMC 2005-He5 MBS' Acts Alleged Herein**

67. The Kelly Family has incurred legal fees and housing counseling services to try to resolve the matters asserted herein. The value of expenses (pre-litigation) is less than or equal to $5,000.

68. Mr. Kelly's lost time from work spending hours on the modifications and attempts to correct BOA's false and misleading communications regarding the modification requests. The value of this loss and damage is less than or equal to $5,000.

69. As a result of the stress and emotional damages discussed below, both the Kelly Family has incurred out of pocket medical expenses and co-pays. The value of this loss and damage is less than or equal to $5,000.

**F.     Non-economic Damages Suffered by the Kelly Family**

70. The Kelly Family's credit has been damaged as a result of the Defendants' delays in processing their modification requests. This damage can be quantified and demonstrated by the higher cost of credit that the Kelly Family has had to pay (i.e. higher interest rates) because of the mortgage situations caused by Defendants' unfair and deceptive practices. This damage and loss has a longer term effect upon the Kelly Family for the foreseeable future as well. The value of this loss and damage is less than or equal to $15,000.

71. As a result of the incorrect and misleading statements and yo-yo consideration of their multiple modification requests, the Kelly Family lives in daily fear that their

credit is ruined and they may lose their home and property where they desire to raise their children and have them complete school—even though , the Kelly Family has done everything reasonable to mitigate the situation and should qualify for a host of different loss mitigation options given in lieu of foreclosure which will only result in a loss for WMC 2005-He5 MBS and a gain for BOA which has no risk in this situation.

72. As a result of the illegal, unfair, and deceptive practices of the BOA described herein, the Kelly Family has emotional loss and damages as well. Mr. Kelly has suffered from severe mental anguish, anxiety, emotional pain and suffering including in his neck, insomnia, worry, and fright over the potential loss of the family home despite his best efforts. Mrs. Kelly has also suffered emotional damages which has manifested through stressed induced problems such as anxiety and stressed induced Irritable bowels. The stress has also negatively affected the Kelly Family's relationship with their children and family members. The value of this loss and damage is less than or equal to $15,000.

### COUNT I – VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT, MD CODE, COMM. LAW, § 14-201 et seq.
### (Against All Defendants)

73. The Kelly Family reiterates and incorporates every allegation above as if set forth herein in full and adds:

74. By threatening and proceeding an intent to foreclose based upon practices described above before correcting the bogus and improper reporting by BOA and WMC 2005-He5 MBS concerning the Kelly Family's modification on the First

Mortgage, BOA and WMC 2005-He5 MBS have acted as collectors as that term is defined by § 14-201(b) of MD. CODE, COMM. LAW.

75. The Plaintiffs are both people as defined by § 14-201(d) of MD. CODE, COMM. LAW.

76. BOA and WMC 2005-He5 MBS has each claimed in bad faith, attempted, or threatened to enforce a right with knowledge that its right did not exist under Maryland law and the various consent orders and settlements to which BOA has entered into promising to make changes to its unsafe, unfair, unsound, or deceptive servicing practices.

77. The Kelly Family's damages as alleged herein were proximately caused by BOA and WMC 2005-He5 MBS's actions, direct and indirect including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above and including ¶¶ 67-72.

78. WMC 2005-He5 MBS is also liable for the actions of its authorized servicer BOA described herein.

WHEREFORE, the Kelly Family prays for the following relief against BOA and WMC 2005-He5 MBS for their violations of the Maryland Consumer Debt Collection Act:

    A. A money judgment of all damages caused by BOA's and WMC 2005-He5 MBS's actions, directly or indirectly, in the sum not to exceed $50,000 for all claims and causes of action combined;

B. Their costs including attorneys' fees as well as pre- and post-judgment interest;

C. Such other and further relief as the nature of their cause may require.

## COUNT II – VIOLATION OF MARYLAND'S CONSUMER PROTECTION ACT, MD. CODE ANN. COM. LAW § 13-101 et. seq.

### (Against All Defendants)

79. The Kelly Family reiterates and incorporates every allegation above as if set forth herein in full and adds:

80. The mortgage loan transactions and foreclosure practices as set forth herein of the Defendants against Plaintiff are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 et. seq.

81. Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts. Md. Code Ann., Com. Law § 13-303.

82. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive. MD. CODE ANN. COM. LAW § 13-301.

28

83. By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, BOA and WMC 2005-He5 MBS has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

84. WMC 2005-He5 MBS is also liable for the acts of its authorized agent, i.e. BOA, dealing with the Kelly Family.

85. BOA's and WMC 2005-He5 MBS's conduct, as set forth above, had the capacity, tendency or effect of deceiving the Kelly Family who in fact was deceived or misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a foreclosure action by BOA directly and indirectly.

86. The Kelly Family's damages as alleged herein were proximately caused by BOA's and WMC 2005-He5 MBS' actions including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above and including ¶¶ 67-72.

WHEREFORE, the Kelly Family prays for the following relief against BOA and WMC 2005-He5 MBS for their violations of the Maryland Consumer Protection Act:

A. They be awarded as part of this claim a sum against each Defendant not to exceed $50,000 for all claims and causes of action combined which represents their compensatory damages as a result of the Defendants' direct and indirect, unfair or deceptive practices as described herein;

B. They be awarded their reasonable attorney's fees and costs; and

C. That their claim should include such other and further relief as the Court deems just and proper.

## COUNT III – MARYLAND MORTGAGE FRAUD PROTECTION ACT, MD. ANN. CODE, REAL PROP. § 7-401 MD. REAL PROP., et seq.
### (Against All Defendants)

87. The Kelly Family reiterates and incorporates every allegation above as if set forth herein in full and adds:

88. The Maryland Mortgage Fraud Protection Act, Md. Ann. Code, Real Prop. § 7-401 MD. REAL PROP., et seq. ("MMFPA") governs the relationship between the Defendants and Plaintiffs.

89. Md Ann. Code., Real Prop. § 7-401 (c) provides: "Homeowner" means a record owner of residential real property. Plaintiffs are the record owners of the residential property in question and therefore is the Homeowner.

90. Md Ann. Code., Real Prop. § 7-401 (e) provides "Mortgage lending process...includes [t]he...servicing...of a mortgage loan."

91. Md Ann. Code., Financial Institutions code. § 11-501 (k)(1) provides: "Mortgage loan" means any loan or other extension of credit that is: (i) Secured, in whole or

30

in part, by any interest in residential real property in Maryland; and (ii) if for personal, household or family purposes, in any amount."

92. The MMFPA works to protect the interests of all parties to mortgage issues in Maryland from misstatements, misrepresentations and omissions; in this instance the MMFPA works to protect borrowers like the Kelly Family from mortgage companies like the Defendants and ensure a level, fair playing field between all borrowers and professionals.

93. The Plaintiffs are homeowners in the Mortgage Lending Process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of her residential mortgage loan as it relates to a foreclosure action or threat of foreclosure which is an attempt to collect a certain sum on the mortgage transaction through the value of her property.

94. Md Ann. Code., Real Prop. § 7-401 (d) provides: "'Mortgage fraud' means any action by a person made with the intent to defraud that involves: (1) Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process; (2) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; (3) Receiving any

proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section; ...or (5) Conspiring to violate any provisions of item of (1), (2) or (3) of this section.

95. The Defendants have committed Mortgage Fraud by:

       i. Knowingly making, as described herein, deliberate misstatements, misrepresentations and omissions during the mortgage lending process, including failing to respond to the Plaintiff's requests for a modification or change of her mortgage loans and the right of the Defendants to seize the Property as part of its foreclosure collection practices, with the intent that the misstatements, misrepresentations and omission be relied on by the Plaintiff and the general public;

      ii. Knowingly using or facilitating, as described herein, the use of any deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, including the state court foreclosure actions it has commenced and carried out, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiff.

96. The Kelly Family's damages as alleged herein were proximately caused by BOA's and WMC 2005-He5 MBS' actions, direct and indirect, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above and including ¶¶ 67-72.

97. WMC 2005-He5 MBS is also liable for its authorized agent BOA acting on its behalf in dealing with the Kelly Family.

WHEREFORE, the Kelly Family's requests the following on her behalf based upon the Defendants' violations of the MMFPA:

A.  They be awarded as part of their claim the sum not to exceed $50,000 for all claims and causes of action combined which represents their compensatory damages as a result of the Defendants' direct and indirect, unfair or deceptive practices as described herein;

B.  They be awarded as part of the claim their reasonable attorney's fees and costs; and

C.  That their claim should include such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Phillip R. Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
Attorneys for Plaintiff

**REQUEST FOR A JURY TRIAL**

Plaintiffs request a jury trial on all claims asserted herein.

Phillip Robinson



Legg Law Firm, LLC
5500 Buck...
Frederick, ...

7011 2000 0002 1903 2891

Baltimore P&DC 212

Bank of America, NA
c/o The Corporation Trust Incorporated
351 West Camden St.
Baltimore, MD  21201

 **CT Corporation**

**Service of Process Transmittal**
08/20/2012
CT Log Number 521071317

**TO:**     CA LegaLit
Bank of America
Litigation Intake, CA6-915-01-17
30870 RUSSELL RANCH RD
Westlake Village, CA 91362

**RE:**     **Process Served in Maryland**

**FOR:**    Bank of America, National Association (Domestic State: N/A)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Brett Kelly and Patricia Borden Kelly, Pltfs. vs. Bank of America, NA and Wells Fargo Bank, NA, etc., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Writ of Summons, Complaint, Request |
| **COURT/AGENCY:** | Baltimore City - Circuit Court, MD Case # 24C12004792OG |
| **NATURE OF ACTION:** | Violation of the Maryland Consumer Debt Collection Act |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Incorporated, Baltimore, MD |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 08/20/2012 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Maryland |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service - Written response |
| **ATTORNEY(S) / SENDER(S):** | Phillip R. Robinson Legg Law Firm, LLC 5500 Buckeystown Pike Frederick, MD 21703 301-620-1016 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/20/2012, Expected Purge Date: 08/25/2012 Image SOP Email Notification, CA LegaLit calegalit@bankofamerica.com |
| **SIGNED:** **PER:** **ADDRESS:** **TELEPHONE:** | The Corporation Trust Incorporated Billie Swoboda 351 West Camden Street Baltimore, MD 21201 410-539-2837 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.